IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DAN D. KEACH,                          )
                                       )
        Plaintiff,                     )
                                       )
vs.                                    )  Case No. 16-cv-470-JPG-CJP
                                       )
NANCY A. BERRYHILL,                    )
Acting Commissioner of Social Security,)
                                       )
        Defendant.[1]                  )

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Dan D. Keach, represented by counsel, seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff filed for DIB and SSI on May 11, 2011, alleging an onset date of July 7, 2009.[2] An unfavorable decision was rendered on August 9, 2013, and the decision was eventually remanded by the Appeals Council. (Tr. 16, 32-45, .)

On September 29, 2014, Administrative Law Judge (ALJ) James E. Craig held that plaintiff was not disabled prior to July 1, 2013, but became disabled on that date. (Tr. 16-28.) Plaintiff exhausted his administrative remedies and filed a timely appeal with this Court. (Tr. 1.)

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred by excluding plaintiff's limitations regarding concentration and

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. *See* https://www.ssa.gov/agency/commissioner.html (visited Feb. 7, 2017). She is automatically substituted as defendant in this case. *See* Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g).

[2] Plaintiff alleges in his brief that he amended his onset date to April 19, 2011. The Court did not locate the amendment and Administrative Law Judge Craig referred to the onset date as July 7, 2009 in his opinion. The discrepancy is ultimately immaterial to this decision.

persistence from the RFC determination.

2. The ALJ improperly interpreted medical evidence in the record.

3. The ALJ erred in assessing plaintiff's credibility.

## **Applicable Legal Standards**

To qualify for DIB and SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation

---
[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

2

continues. The fourth step assesses an applicant's residual functional capacity ("RFC") and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008); *accord Weatherbee v. Astrue*, 649 F.3d 565, 568-69 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984); *see also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any

fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, *i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Craig, in his decision from September 29, 2014, followed the five-step analytical framework set forth above. He determined that plaintiff had severe impairments of chronic obstructive pulmonary disease (COPD), spine disorder, bilateral hip disorder, right elbow impairment, alcohol dependence, and alcohol induced dementia since the alleged onset date of July 7, 2009. Plaintiff was insured for DIB through June 30, 2016. (Tr. 19.)

He further opined that prior to July 1, 2013 plaintiff had the RFC to perform light work. After July 1, 2013, plaintiff had the RFC to perform sedentary work. The following exceptions were included in both RFC assessments: plaintiff could have no exposure to dangerous moving mechanical parts, electrical shock, high places, weather, extreme heat and cold, wetness and humidity, and noxious fumes or odors. Furthermore, he could not perform detailed or complex

4

work, his work should be three steps or less, he could not perform work with fast pace or strict quotas, his work should be object-oriented rather than dealing with data and/or people to complete the work process, and he could have only occasional, intermittent contact with coworkers and supervisors. He could not have contact with the public. (Tr. 19-25.)

The ALJ went on to determine that before July 1, 2013, jobs existed in the national economy that plaintiff could perform. (Tr. 26.) As of July 1, 2013, plaintiff transitioned from being a "younger person" to an individual "closely approaching advanced age" under 20 C.F.R. § 404.1563. The ALJ found that, as of this date, plaintiff was limited to sedentary work, and there were no jobs that plaintiff could perform. (Tr. 27.) Thus, the ALJ concluded that plaintiff was not disabled prior to July 1, 2013, but became disabled on that date and continued to be disabled through the date of his decision. (Tr. 28.)

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

Plaintiff completed his initial function and disability report in June 2011. (Tr. 271-87.) He stated he had issues with his lungs that caused coughing and shortness of breath. He also experienced memory issues, confusion, and difficulty with comprehension and learning. Plaintiff had anxiety attacks and social withdrawal. (Tr. 271.)

Plaintiff alleged conditions of COPD, dementia, high blood pressure, and anxiety. (Tr. 281.) He took Atarax for anxiety, Combivent for COPD, Doxazosin and Metoprolol for blood pressure, potassium, and Furosemide. (Tr. 284.) His medications caused weakness, ringing in his ears, and dizziness. They also made him tired. (Tr. 278.)

5

Plaintiff completed the twelfth grade and received specialized training in welding and blueprint reading. He worked as a welder from 1979 to 2002 and then again from 2004 to 2010. He briefly held a position as a cleaning person in 2004. (Tr. 282.)

Plaintiff needed reminders to go grocery shopping and take his medications. His daughter brought him food. He was able to do the dishes and laundry but had to take several breaks. (Tr. 272.) He did not drive due to anxiety attacks and was unable to manage his finances because he could not remember when bills were due. (Tr. 273.)

Anxiety and breathing issues made it difficult for plaintiff to sleep. He watched television or napped throughout the day. (Tr. 274.) His hobbies included watching television, fishing, camping, constructing model cars, and four-wheeling. He was unable to go camping or four-wheeling, however, because of breathing problems and anxiety. Plaintiff's daughter visited him every day, and she occasionally took him places. (Tr. 275.)

Plaintiff had problems getting along with others because of mood swings. His inability to understand caused panic attacks. (Tr. 276.) Plaintiff was also limited in his ability to lift, stand, reach, walk, talk, climb stairs, complete tasks, concentrate, understand and remember things, and follow instructions. He could walk less than three blocks without needing to stop and rest for approximately three to five minutes. He could pay attention for about ten minutes. He could follow written instructions "OK" if he took his time and remembered to read them. He did not follow spoken instructions very well and needed them explained multiple times in terms he understood. (Tr. 276.) Authority figures usually did not understand plaintiff, which caused him to get mad and have "fits." However, he was never fired from a job due to an inability to get along with other people. He did not handle stress well and could not handle changes in routine "at all." (Tr. 277.)

Plaintiff completed subsequent disability reports. (Tr. 240-44, 253-57.) In October 2011,

6

he stated he was prescribed Atarax and Buspirone for anxiety, Combivent for COPD, Doxazosin, Metoprolol, and Potassium for high blood pressure, and Furosemine, which is a water pill. (Tr. 255.) In March 2012 he was taking Omnibivent for COPD and Metoprolol for high blood pressure. (Tr. 242.) Plaintiff stated he continued to have memory loss, trouble focusing, and difficulty planning. (Tr. 243, 255.)

### 2. Evidentiary Hearing

An initial evidentiary hearing was held on May 10, 2013, before ALJ Linda S. Halperin. (Tr. 980-1013.) After remand from the Appeals Council, a subsequent hearing was held on August 5, 2014, before ALJ Craig (Tr. 1014-32). Plaintiff was represented by counsel at both hearings.

At the second hearing, the ALJ asked the vocational expert (VE) to consider an individual with plaintiff's educational and vocational background who was limited to light work. Furthermore, the person could have no exposure to weather, extreme heat or cold, wetness, humidity, dangerous and moving mechanical parts, electrical shock, and high places. (Tr. 137-38.) The individual could also not be exposed to noxious fumes or odors. He could not perform detailed or complex work or work that involved contact with the public. This person could have intermittent contact with supervisors and co-workers. Jobs could involve three steps or less but could not be detailed-oriented or involve strict quotas. The VE opined that this person could not perform plaintiff's past work. Furthermore, there were no skills that would transfer from plaintiff's past work to light exertional work. (Tr. 138.) However, light, unskilled positions with an SVP[4] of two were available in the national economy that the hypothetical person could hold, such as housekeeping, machine tender, and inspector positions. (Tr. 138-39.)

---

[4] SVP stands for "specific vocational preparation" and indicates on a scale of one to nine the amount of time required for a typical claimant to "[l]earn the techniques, [a]cquire the information, and [d]evelop the facility needed for average performance in a job." *see* Social Security Administration Program Operations Manual System DI 25001.001A.77, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001#a77 (visited June 29, 2017).

The VE testified that if this same individual could perform his job less than six out of eight hours at least three times per month, there would be no jobs available he could perform. If the individual left the workstation two or three times per day for a fourth of an hour other than for meals and breaks, there would be no jobs available to him. (Tr. 139-40.) If the individual missed work three days a month or more, there would be no jobs available to him. (Tr. 140.)

Individuals are expected to learn a light, unskilled job in thirty days or less. If someone were unable to do so, he would not be able to maintain employment in any unskilled positions with an SVP of two. (Tr. 140.)

### 3. Medical Records

On April 19, 2011, plaintiff presented to the Sarah Bush Lincoln Health Center for vomiting that lasted four days. (Tr. 381.) Plaintiff was admitted to the psychiatric department for delirium tremens and alcohol-induced mood disorder. (Tr. 393.) He was also diagnosed with alcohol dependence, opiate abuse, hypertension, shingles, chronic back pain, hematemesis, possible esophageal stricture, and COPD. (Tr. 384.) A CT scan of his brain showed atrophy and small vessel ischemic changes. (Tr. 386.) Plaintiff's Global Assessment of Functioning (GAF) score[5] was assessed at fifteen-twenty. Plaintiff successfully underwent detoxification, his delirium resolved, his condition was stabilized, and he was discharged to home. (Tr. 394-95.)

On April 29, 2011, plaintiff presented to Dr. Sherri Howell to establish care following his hospitalization. She diagnosed him with hypertension, chronic alcohol abuse, alcohol-induced dementia, electrolyte abnormalities, generalized anxiety disorder, and COPD. Plaintiff's daughter was also present and reported plaintiff could not retain significant information, had terrible short-term memory, was very labile, and had difficulty socializing. (Tr. 373-74.)

---

[5] A GAF score "is a numeric scale of 0 through 100 used to assess severity of symptoms and functional level." *Yurt v. Colvin*, 758 F.3d 850, 853 n.2 (7th Cir. 2014) (citing *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 32 (5th ed. Text revision 2000)).

8

Dr. Howell noted that plaintiff had trouble retaining information on physical exam, appeared anxious, and asked her several questions more than once. His judgment and insight were extremely limited. She referred him for counseling, switched him to Doxazosin, and planned to monitor his blood pressure. (Tr. 374.) Dr. Howell also completed a Disability Income Physician's Statement for Illinois Mutual, listing a date of total disability as April 19, 2011 to "present." She noted that the disability was continuing. (Tr. 403.)

Dr. Vittal Chapa examined plaintiff on August 2, 2011. (Tr. 434-36.) He noted that plaintiff was alert and oriented times three, answered questions appropriately, and was in good contact with reality. (Tr. 435.)

On February 29, 2012, plaintiff reported pain and numbness in his hand during the night. During a physical examination, Dr. Howell noted plaintiff appeared anxious. She assessed him as having paresthesia secondary to his sleeping position. (Tr. 329-31.)

Plaintiff treated with Dr. Keith Ballinger in 2013 and 2014. He presented in a pleasant mood and was oriented, cooperative, and appropriately groomed. (Tr. 896, 904, 913.) Dr. Ballinger noted that plaintiff had barriers to learning about financial matters and his comprehension ability was "fair." (Tr. 889, 910.) Plaintiff denied mood changes, anxiety, and depression. (Tr. 904, 919.) On March 6, 2014, plaintiff reported often experiencing uncontrollable anger. (Tr. 917.)

On January 20, 2014, plaintiff attended an orthopedic evaluation for hip pain. The physician noted he was alert and oriented times three and extremely pleasant. He assessed plaintiff with symptomatic avascular necrosis of the right hip with early subchondral collapse. (Tr. 966.) Plaintiff underwent a right total hip arthroplasty on March 11, 2014. (Tr. 962-64.)

On April 9, 2014, a physical therapist wrote "none" under "fears and anxiety." No teaching barriers were noted, plaintiff's comprehension ability was "good," and he demonstrated

9

the ability to recall instructions at three or more step points. The therapist marked "No" next to non-compliance and confusion. (Tr. 933-35.)

    4.    **Dr. Boyd's Consultative Examination**

On August 2, 2011, Dr. Jerry Boyd conducted a psychological evaluation of plaintiff. (Tr. 427-31.) Plaintiff was alert and oriented times four. His short-term memory showed mild impairment with five digits forward, three digits backward, and a recall of zero of three objects after more than five minutes. He made no errors on simple calculations but declined serial sevens. His remote memory was intact. He had no difficult stating his address, phone number, birthdate, and other features of identifying information. (Tr. 429.)

Plaintiff's intelligence was estimated to be within the normal range, judgment and maturity appeared to be at age level, and insight was limited. His thought processes were normal in content. Flow was marked by a mild degree of vagueness and blocking. There was no evidence of looseness of associations or obvious defects of perception. Reality testing was intact, and there were no gross signs of psychosis or paranoia. His thought processes were logical and goal directed. There were no indications of gross disorganization of thought. Plaintiff's speech was generally productive, and he had infrequent blocking. There was evidence of preservation as well. (Tr. 429.)

Dr. Boyd diagnosed plaintiff with depressive disorder with agitation, alcohol dependence, and alcohol-induced dementia. His current GAF score was fifty, which matched his highest GAF score of fifty within the previous year. Dr. Boyd opined plaintiff was of average intelligence and could follow moderately complex instructions if he could hear them. He was an adequate communicator but required raised voice. (Tr. 430.)

Plaintiff had a reduced stress tolerance and appeared to be having withdrawal from alcohol. His daughter indicated he drank large quantities of alcohol daily, was inappropriate in

10

social settings, and was unreliable about taking medication. She reported that she had to watch him and provide supervision. He had recently mistakenly eaten dog food. (Tr. 431.)

Plaintiff appeared to be of reduced persistence in association with alcoholism, depression, pain, and agitation. The examination indicated plaintiff could manage his own funds. (Tr. 431.)

5.  **Dr. Low's Mental RFC Assessment**

Dr. Thomas Low, another state-agency consultant, completed a Psychiatric Review Technique Form and a Mental RFC Assessment (MRFCA) of plaintiff on December 29, 2011. (Tr. 345-61.) He determined that plaintiff's psychological conditions moderately restricted his activities of daily living, made it mildly difficult for him to maintain social function, and would cause one or two episodes of decompensation. (Tr. 355.) Furthermore, plaintiff was moderately limited in (1) the ability to carry out detailed instructions, (2) the ability to maintain attention and concentration for extended periods, and (3) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 359-60.)

Dr. Low recognized that plaintiff had difficulty answering questions but no problems understanding, concentrating, or reading. He opined that plaintiff was "at most partially credible." (Tr. 357.) He noted that although alcohol-induced dementia was reported in treatment notes, it was not clearly seen in the mental status exam. (Tr. 361.)

Dr. Low assessed that plaintiff would have problems with complex directions and had limited concentration due to alcohol abuse and depression but could recall simple directions and do simple tasks. He could concentrate well enough to follow simple requests and work in routine settings. According to Dr. Low, plaintiff retained the capacity to work. (Tr. 361.)

6.  **Dr. Frey's Consultative Examination**

In February 2012, Dr. Marilyn Marks Frey conducted two psychological evaluations of

plaintiff. Prior to each meeting, blood level tests showed plaintiff's blood alcohol level was less than .01.

Dr. Frey determined that plaintiff's cognitive estimate was low average, with significant memory deficits, problems focusing, and difficulty in performing two and more step processing functions without rehearsal. (Tr. 334.)

Dr. Frey diagnosed plaintiff with dementia due to chronic substance abuse, general anxiety disorder, major depression, cognitive disorder, COPD, high blood pressure, and severe residuals from chronic substance abuse. (Tr. 337.)

## **Analysis**

Plaintiff first argues the ALJ improperly excluded plaintiff's limitations in concentration and persistence from the RFC assessment.

A plaintiff's RFC is "the most [the claimant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). In assessing a claimant's RFC, the ALJ must consider all of the relevant evidence in the record and provide a "narrative discussion" that cites to specific evidence and describes how that evidence supports the assessment. The ALJ's analysis and discussion should be thorough and "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." Social Security Ruling 96-8P, 1996 WL 374184, at *7 (July 2, 1996) ("S.S.R. 96-8P").

Section I of an MRFCA:

contains twenty mental functions grouped under four main categories: (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. To the right of each of the items is a series of decision check blocks under the headings 'not significantly limited,' 'moderately limited,' 'markedly limited,' 'no evidence of limitation,' and 'not ratable on available evidence.'

*Varga v. Colvin*, 794 F.3d 809, 811 at n.1 (7th Cir. 2015).

The ALJ assigned "significant" weight to Dr. Low's MRFCA, which concluded that

12

plaintiff was moderately limited in (1) the ability to carry out detailed instructions, (2) the ability to maintain attention and concentration for extended periods, and (3) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. All of these functions fall under the category of "sustained concentration and persistence." (Tr. 359-60.) Despite adopting Dr. Low's opinion and acknowledging that plaintiff was limited in concentration and persistence, the ALJ did not account for concentration and persistence in the RFC determination or discuss Dr. Low's findings from Section I of the MRFCA.

Defendant notes that the ALJ failed to mention "Dr. Low's opinion in the check-box section of his report." To the extent defendant is minimizing the importance of the findings in Section I, the Seventh Circuit has stressed that these observations are still "medical evidence which cannot just be ignored." *Varga*, 794 F.3d at 816.

Moreover, despite binding precedent to the contrary, defendant argues the ALJ's RFC determination sufficiently accommodates plaintiff's limitations with concentration and persistence by confining plaintiff to "simple tasks that are three steps or less, without fast pace or strict quotas. . . ." (Tr. 22-23.) The Seventh Circuit has addressed each one of these restrictions and repeatedly held that none of them adequately captures limitations of concentration and persistence. *Yurt v. Colvin*, 758 F.3d 850, 858-59 (7th Cir. 2014) (confining a plaintiff to simple tasks does not accommodate problems with concentration and persistence); *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015) (excluding fast paced production requirements does not adequately account for difficulty maintaining concentration and persistence); *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 698 (7th Cir. 2016) ("[T]he Commissioner has not cited, nor have we found, any authority supporting the ALJ's speculation that eliminating jobs with strict production quotas or a fast pace may serve as a proxy for including, as part of the claimant's mental residual

13

functional capacity, a moderate limitation on concentration, persistence, and pace.").

For the foregoing reasons, the ALJ failed to build a logical bridge between the evidence of mental impairments and the RFC.  Because remand is required on this point, the Court will not address plaintiff's other arguments.  Of course, on remand, the ALJ must consider all of the medical evidence in the record and properly address plaintiff's daily activities in assessing his credibility, in accordance with 20 C.F.R. § 404.1529.

## Conclusion

The Commissioner's final decision denying application for social security DIB and SSI is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**
**DATE: June 29, 2017**

                                            s/ J. Phil Gilbert
                                            **J. PHIL GILBERT**
                                            **DISTRICT JUDGE**